15563

STATE v. DAWSON

(26 S. E. (2d), 506)

February, 1943.

*Messrs. Blease & Griffith,* of Newberry, S. C., and *Messrs. Blackwell, Sullivan & Wilson,* of Laurens. S. C., Counsel for Appellant,

*Mr. B. V. Chapman,* Solicitor, of Newberry, S. C., and *Mr. O. L. Long,* of Laurens, S. C., Counsel for The State, Respondent,

July 19, 1943.

CIRCUIT JUDGE THOS. S. SEASE, ACTING ASSOCIATE JUSTICE, delivered the unanimous opinion of the Court:

At the February, 1943, term of the Court of General Sessions for Laurens County, the defendant, Fred Dawson, was tried on an indictment charging him with the murder of one Irvin Jones. A verdict of guilty with recommendation to mercy was rendered by the jury and the defendant was thereupon sentenced by his Honor J. Henry Johnson, Presiding Judge, to life imprisonment. From the judgment and sentence of the Court imposed upon him, he has appealed to this Court upon five exceptions. However, the appellant abandoned the fifth exception and in his argument treated the third and fourth exceptions together. We shall consider the exceptions in the same manner.

The first exception imputes error to the Presiding Judge in ruling inadmissible certain testimony of a trained nurse, Miss Julia G. Pettit, to the effect that on the morning after the defendant had fatally stabbed the deceased at his filling station near Watts Mills, and while the deceased was in the Laurens County Hospital, that he said to Miss Pettit in the presence of his wife: "I want to get well so I can apologize to Mr. Dawson."

We are of the opinion that the Presiding Judge was correct in excluding this testimony. It seems that the statement was not offered as a dying declaration nor as proof of any threat made by the deceased against the defendant. However, on appeal counsel took the position that at the time the testimony was offered that they did not have before them the testimony of Mr. Ernest Garrett, and, therefore, they should be given the benefit before this Court of having offered the statement as a dying declaration.

The testimony was offered, according to the record, as a statement having been made by the deceased against interest and as a part of the *res gestae*. We do not know of any exception to the "hearsay" rule which makes declarations against interest of parties who later die competent

either for or against the defendant. Certainly the testimony is no part of the *res gestae*. The death wounds were inflicted at the place of business of the defendant on Sunday night about 9 o'clock and the statement was alleged to have been made in the hospital the next morning about 9 or 9:30 o'clock. By no stretch of the imagination could the statement, under these circumstances, be termed a part of the *res gestae*.

In the case of *State v. Rice,* 49 S. C., 418, 27 S. E., 452, 61 Am. St. Rep., 816, this Court held as follows: "Testimony of a witness as to what prosecutrix told him on the morning after the alleged criminal act was committed was hearsay."

In the case of *State v. Belcher,* 13, S. C., 459, in passing on a similar question the Court ruled as follows: "Statements of the deceased to her attending physician, detailing the cause of the injuries from which death ensued, made some time after the occurrence, are not admissible in evidence against the accused as part of the *res gestae,* upon his trial for her murder."

We realize that we are not bound by decisions of other States but we agree fully with the holding of the Supreme Court of Georgia in the case of *Cole v. State,* 125 Ga., 276, 53 S. E., 598, to the effect: "Where a difficulty occurred at night between the accused, and the deceased, and the former struck the latter on the head, from which injury the deceased afterwards died, evidence that, on the morning after such difficulty, the person so stricken stated to the accused and a witness that he himself was to blame for the difficulty, and that he apologized for the way he had treated the accused, was properly rejected; it not appearing that this was a dying declaration, or was offered in rebuttal of any dying declaration."

This Court has just as clearly announced the same rule but under different states of fact in two important capital cases. In the case of *State v. Bigham,* 133 S. C., 491, 131 S.

E., 603, 605, the Court speaking through Mr. Associate Justice Watts, later Chief Justice, stated this rule of evidence as follows: "Statements of the deceased, and declarations made by him, are not competent evidence either for or against the accused, unless made in his presence or unless they are admitted in evidence as part of *res gestae* or dying declarations or proved by the defendant as threats against him."

In the case of *State v. Hester,* 137 S. C., 145, 134 S. E., 885, 902, Mr. Associate Justice Blease, later Chief Justice and now a member of defense counsel in this case, stated the rule as follows: "It is true, as a rule, that testimony as to a conversation between a deceased person and a third party, when the accused is not present, is inadmissible, unless the same can be brought within the rule of *res gestae* testimony."

As authority for this statement he cited the case of *State v. Bigham, supra.*

In view of previous decisions of this Court to the effect that in a capital case the accused is entitled to the benefit of any error appearing on the record without regard to technicalities we are inclined to consider the testimony as if offered as a dying declaration. When so considered it would have been admissible if it had been shown by evidence that the death of the deceased was imminent; that he was fully aware himself of approaching death so much so as to be without hope of recovery; and that the subject of the charges was the death of the declarant, and that the circumstances of the death of the declarant were the subject of the declarations. Under the testimony the first requirement of admissibility might have been present especially in view of the fact that the deceased did expire between 11 and 12 o'clock on the same day. However, none of the other requirements were present and for this reason it was clearly incompetent as a dying declaration if it had been so offered. *State v. Franklin,* 80 S. C., 332, 60 S. E., 953; *State v. Bannister,* 35 S. C., 290, 295, 14 S. E., 678.

By the second exception it is urged that the presiding Judge erred in refusing the defendant's motion for a new trial on the ground that one of the bailiffs, Mr. D. F. Little, became intoxicated while discharging his duties as a bailiff.

As nearly as can be ascertained from the record it appears that the trial commenced some time Monday and that the presiding Judge thought it best to keep the jury together during the progress of the trial and had the sheriff to arrange for lodging for them at the Laurens Hotel. The back of this hotel is just across the street from the Court House but the entrance is on the street in front of the jail, and is reached from the Court house by going down an alley for about one block. The case did not reach the jury until about 2:30 p. m. Wednesday and a verdict was reached that night about 11 o'clock. The jury was at the hotel Monday night and Tuesday night both prior to the time the case was given to them for consideration. The two bailiffs who served on Monday night were relieved and the sheriff assigned two new bailiffs, Mr. John Martin and Mr. D. F. Little, to take charge of the jury Tuesday night.

It is admitted that when the jury approached the Court house on Wednesday morning Mr. Little was observed by the sheriff to be in an intoxicated condition but not unable to walk. The sheriff followed and overtook him at the top of the steps leading into the Court house. According to the testimony of the sheriff the jury had followed the head bailiff on into the Court house and the last jurors were going in the inside door of the Court house when he took charge of Mr. Little. There is nothing to show that any of the jurors saw the sheriff when he took charge of the bailiff. Mr. Martin, who seems to be a highly respected citizen of Laurens County, testified that he did not know Mr. Little was drinking and that he attended to his duties as a bailiff. He was positive that no one talked to the jury or communicated with them otherwise. The presiding Judge stated in his ruling on the motion that he stayed at the same hotel and that

he saw Mr. Little late on Tuesday night and that he was apparently sober then. Little testified that he got his whiskey just before breakfast Wednesday morning and had been drinking only a short time.

It is in the discretion of a trial Judge as to whether or not he will keep a jury together during the progress of a trial. The sole purpose for keeping a jury together and placing them in charge of bailiffs during a trial is to see that they are not subjected to any outside influence by word or act. *State v. Emory,* 178 S. C., 461, 183 S. E., 323. There is no showing here that any outside influence reached the jury. The reverse is true. The entire matter was largely in the discretion of the presiding Judge and we see no abuse of discretion in refusing the motion of this ground.

As to the third and fourth exceptions which were argued together.

The appellants contend that the Circuit Judge erred in charging the jury in his supplemental charge as follows: "Every mistrial is at least a temporary miscarriage of justice"; and further contend that the charge considered as a whole tended to coerce the jury.

In considering the statement: "Every mistrial is at least a temporary miscarriage of justice"; we must consider it in connection with the charge as a whole. This statement was made in connection with other remarks charging the jury with its duty to agree on a verdict. Immediately following the statement the Judge said: "If a man be innocent, he is entitled to have a jury of his peers promptly declare him to be innocent, to the end that the cloud which hangs over his good name may be removed, and to the end that he may be saved the expense, loss of time, and trouble of a second trial. So also the State, if a man actually be guilty, the State, on the other hand is entitled to promptly have him declared to be guilty, to the end that he may pay the penalty of his crime, to the end that his conviction may

serve as a deterrent to prevent others from committing like crimes. So the State is entitled, if a man actually be guilty, to have him promptly declared so, to the end that it may be saved the trouble and expense and loss of time of another trial."

At the conclusion of this explanation he again told the jury that for these reasons he had made the statement that "Every mistrial is at least a temporary miscarriage of justice."

He probably realized that the statement standing alone might be misconstrued so he immediately explained to the jury exactly what he meant to convey by the statement. Then, too, he concluded his charge with this statement: "Nothing that I have said is to be considered by you as meaning that you must go out to your room and agree upon a verdict simply for the purpose of reaching a verdict. I have not implied that, intimated it, or insinuated it. All that I ask you to do is to go back out there and put behind you what has gone before, listen in a calm, quiet manner to the arguments of the different sides with one purpose only in view—I don't mean to intimate or insinuate that anybody on that jury has got any other purpose—with the sole aim before you to see if you can come to an agreement that will speak the truth and do justice both to the State and the accused in this case."

The sole inquiry here is whether or not the supplemental charge to the jury, including the statement: "Every mistrial is at least a temporary miscarriage of justice," tended to coerce the jury in reaching a verdict.

The law is well established in this State to the effect that it is the duty of a Circuit Judge to the public, and especially to the litigants, to urge a jury to reach a verdict provided nothing like coercion takes place. *State v. Jones*, 86 S. C., 17, 67 S. E., 160; *Nickles v. Seaboard Air Line Ry.*, 74 S. C., 102, 141, 54 S. E., 255, 268; *Coleman v. Stevens*, 124 S. C., 8, 117 S. E., 305; *State v. Drakeford*, 120 S. C., 400, 113 S. E., 307.

The question of whether or not the supplemental charge to the jury, when considered as a whole, amounted to coercion as a matter of law should be considered in the light of a long line of decisions of this Court on the subject.

In the case of *State v. Jones, supra,* the presiding Judge under conditions very much the same as those which existed in the present case, charged the jury as follows: "I have called you out and had you brought out, Mr. Foreman and gentlemen, to urge upon you the importance of reaching a verdict in the case we are now considering. You have been engaged in the case ever since Wednesday afternoon and have had it under actual consideration, under the charge of the judge, ever since 9 o'clock last night, and I want to impress upon you, gentlemen, that you should reach an agreement in the case. The whole testimony is before you, the law of the case has been explained to you, and you ought to realize that an immense amount of labor and of talent has been employed in presenting the case to you, and you have it as fairly before you as any jury could have it, and there is no reason why you should not be able to decide it. These mistrials ought not to occur. The county is at great expense in trying the case, and you ought, if possible, reach some conclusion in the matter. Of course, while that is an element you ought not to consider when a human life is at stake, still you ought to try and reach a verdict. Some one has to do it, some 12 men sitting where you are have to decide this matter, and you don't want it said that you could not agree, that you were brought here and this trial gone through with, the case presented to you, and you could not decide it in some way. You don't want to shift your responsibility upon some one else. Some 12 men have to decide the case, and it is not a fair thing to want to shift the responsibility of deciding the case on some one else by holding out a great length of time and getting the judge to order a mistrial. I know it is a very hard matter sometimes to decide questions of fact. I know that from my own experience, because I have to decide a great many of them

on the equity side of the court. I know it is hard, and I sympathize with you gentlemen; but because it is hard is no reason why you should dodge it. I would not want to dodge a case and throw it upon my successor, and I would not want it said that I shirked my responsibility, and I think you gentlemen ought to feel that way about it."

This language is much stronger than that used by· Judge Johnson in the present case. In this case the Judge pointed out to the jury that if a defendant is innocent he is entitled to have a jury promptly declare him innocent and directed their attention to the expense and loss of time incident to a second trial. At the same time he pointed out to them that the State was entitled to have him found guilty, if he is guilty, in order that it might save the cost and trouble of another trial and in order that his conviction might act as a deterrent to crime. Judge Memminger in the *Jones case* [86 S. C., 17, 67 S. E., 163] assigned pactically the same reasons why a jury should agree on a verdict if possible, and added many more reasons. In that case he went so far as to state to the jury: "Mistrials ought not to occur"; and stated to them that: "I would not want to dodge a case and throw it upon my successor, and I would not ·want it said that I shirked my responsibility." No language nearly so strong was used by Judge Johnson in the present case.

In the case of *Coleman v. Stevens, supra* [124 S. C., 8, 117 S. E., 308], after the jury had deliberated all night they were brought into the Court room by order of the Court and charged among other things the following to which exception was taken:

"I know this jury measures up in intelligence with any you can get to pass on this case. If you can't decide it, who can you hope to get to decide it? Without meaning any reflection on you at all, the fact that you fail to do this work is just analogous to a situation in time of war, when a regiment is called on to perform a certain duty and they say: 'We can't do it; you will have to get someone else.'

"Is it possible that the truth is so elusive that twelve men, after deliberating, can't find what the truth is? If that were true we will have practically lapsed back into the ages where we came from."

In affirming the judgment of the Circuit Court in that case Mr. Associate Justice Marion writing the opinion used this language: "Perhaps the analogy between the duty of a jury as to reaching a verdict and that of a regiment in time of war, called upon to perform a service, is not so close as to make it an altogether happy illustration for general use in admonishing juries. But the foregoing portions of Judge McIver's address constituted only a small part of what was on the whole an admirably impartial, appropriate, and courteous appeal to the jury to make every reasonable effort faithfully to discharge the duty imposed upon them. There was no suggestion of a threat as to keeping the jury together for a definite or indefinite time; no suggestion of an order or command that they must agree; no emphasis upon or reference to any phase of the facts in issue; no exhortation that did not redound as fully to the benefit of the plaintiff as of the defendants; no objections as to the alleged coercive nature of the Judge's remarks was interposed at the trial; and, in the light of long experience as a trial lawyer, the writer hazards the surmise that this appeal of the courtly McIver was not unfavorably regarded by plaintiff's counsel at the time of its deliverance."

This language seems particularly appropriate here. Perhaps the bald statement: "Every mistrial is at least a temporary miscarriage of justice", standing alone is not an entirely happy one for admonishing juries generally. But this portion of Judge Johnson's address to the jury constituted only a small part of what was on the whole an impartial, appropriate, and courteous appeal to the jury to make every reasonable effort to discharge the duties imposed upon them. The jury had been out only a short time and there was no threat of keeping them for any defi-

nite or indefinite period. In fact, in arriving at a verdict they deliberated from only around 2 p. m. until about 11 o'clock that night. There was no suggestion that they must agree as there was in the case of *State v. Drakeford, supra,* but to the contrary right at the end of his remarks Judge Johnson told them that they should not agree on a verdict simply for the purpose of reaching a verdict.

There are no exceptions to the main charge of the presiding Judge so we must assume that it was without error. The appellant's only criticism of his charge is that the supplemental charge, and especially the statement that "Every mistrial is at least a temporary miscarriage of justice," tended to coerce the jury.

As stated by this Court in the case of *Coleman v. Stevens, supra:* "We are not prepared to approve the general proposition that pure moral suasion to discharge an important duty in a righteous way may be so strong as to constitute error of law."

We approve of the following statement of this Court used in the case of *Nickles v. Seaboard Air Line Ry., supra,* and reiterated in the case of *State v. Jones* to the effect that: "It is important that the trial of causes should be ended. The circuit judge is but discharging his duty to the public, and especially to the litigants, when he urges the jury to reach a verdict, provided nothing like coercion takes place."

We are of the opinion that the expression complained of when considered in the light of the reasons given for it, and considered in connection with the charge as a whole, did not amount to coercion and that the defendant's rights were not prejudiced thereby.

All exceptions are overruled and the judgment of the Circuit Court is affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and STUKES, and CIRCUIT JUDGE E. H. HENDERSON, ACTING ASSOCIATE JUSTICE, concur.